UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SAMUEL D. HEARNES, JR., | ) | 1:02-CV-6184 AWI SMS HC |
| Petitioner, | ) | |
| v. | ) | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| DAVID L. RUNNELS, Warden, | ) | |
| Respondent. | ) | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented in this action by Frank G. Prantil, Esq.

Due to the death of Magistrate Judge Hollis G. Best and the appointment of Magistrate Judge William M. Wunderlich, by order dated May 2, 2004, this case was reassigned to Magistrate Judge Lawrence J. O'Neill for all further proceedings. Upon reviewing the petition, it came to the Court's attention that Magistrate Judge Lawrence J. O'Neill was the sentencing judge at Petitioner's state trial. Therefore, on October 14, 2005, the action was reassigned to the undersigned for all further proceedings.

**PROCEDURAL HISTORY**[1]

Petitioner is currently in the custody of the California Department of Corrections pursuant to

---

[1] This information is derived from the first amended petition for writ of habeas corpus, Respondent's answer to the petition, and Petitioner's traverse to Respondent's answer.

1 a judgment of the Superior Court of California, County of Fresno, following his conviction by jury
2 trial on June 13, 1997, of second degree murder in violation of Cal. Penal Code § 187. See Exhibit
3 D, Answer to Petition for Writ of Habeas Corpus (hereinafter "Answer"). The jury also found true
4 the allegation that Petitioner had personally used a firearm in committing the offense in violation of
5 Cal. Penal Code § 12022.5. Id. Petitioner was sentenced to an indeterminate term of 15 years to life
6 plus ten years. Id.

7 Thereafter, Petitioner filed a notice of appeal with the California Court of Appeal, Fifth
8 Appellate District (hereinafter "5th DCA"). On October 23, 1998, the 5th DCA issued an unpublished
9 opinion. Id. The 5th DCA rejected Petitioner's evidentiary and jury instruction contentions; however,
10 the court reversed and remanded the matter to the trial court "to hear and consider [Petitioner's]
11 complaints about his trial attorney's competence, to exercise its discretion on whether to appoint new
12 counsel, and to consider a motion for new trial on that ground." Id.

13 Petitioner then filed a petition for review in the California Supreme Court. See Exhibit E,
14 Answer. On January 13, 1999, the petition was denied. See Exhibit F, Answer.

15 On February 4, 1999, the trial court conducted a post-remand hearing and concluded that
16 Petitioner did not receive ineffective assistance of counsel, determined that new counsel would not
17 be appointed, and denied the motion for new trial. See Reporter's Transcript on Appeal ("Hearing
18 RT") at 60-61.

19 On July 28, 1999, Petitioner filed a second appeal to the 5th DCA challenging the outcome of
20 the post-remand hearing. See Exhibit G, Answer. On August 10, 2000, the 5th DCA affirmed the
21 judgment. See Exhibit I, Answer.

22 On September 19, 2000, Petitioner filed a second petition for review in the California
23 Supreme Court. See Exhibit J, Answer. On October 25, 2000, the petition was summarily denied.
24 See Exhibit K, Answer.

25 On February 1, 2002, Petitioner filed a petition for writ of habeas corpus in the Fresno
26 County Superior Court. See Exhibit L, Answer. On February 13, 2002, the petition was denied with
27 citation to In re Clark, 5 Cal.4th 750 (1993). See Exhibit M, Answer.

28 On March 7, 2002, Petitioner filed a petition for writ of habeas corpus in the 5th DCA. See

1  Exhibit N, Answer. On March 21, 2002, the petition was summarily denied. See Exhibit O, Answer.

2  On April 5, 2002, Petitioner filed a petition for writ of habeas corpus in the California
3  Supreme Court. See Exhibit P, Answer. On August 14, 2002, the petition was summarily denied. See
4  Exhibit Q, Answer.

5  On September 13, 2002, Petitioner filed a federal habeas petition in the United States District
6  Court for the Eastern District of California, Sacramento Division. By order of the Court dated
7  September 26, 2002, the matter was transferred to the Fresno Division. After Magistrate Judge Hollis
8  G. Best granted Petitioner's motion to file an amended petition, on April 14, 2003, Petitioner filed a
9  first amended petition in which he raises the following claims: 1) "Hearnes' conviction is
10 unconstitutional because he did not receive effective assistance of counsel as guaranteed by the Sixth
11 Amendment"; 2) "Petitioner was deprived of his right to a fair trial and his conviction violates
12 federal due process of law because of the cumulative impact from the multitude of errors committed
13 by the trial court, and defense counsel"; 3) "The trial court violated due process by failing to instruct
14 on voluntary manslaughter"; 4) "The trial court violated due process as guaranteed by the 14th
15 Amendment by erroneously defining implied malice"; and 5) "The trial court violated due process as
16 guaranteed by the Fourteenth Amendment, and Petitioner's right to confrontation, as guaranteed by
17 the Sixth Amendment, by the trial court reading back testimony without Petitioner's presence or
18 consent."

19 On December 30, 2003, Respondent filed an answer to the petition.
20 On February 2, 2004, Petitioner filed a traverse.

**FACTUAL BACKGROUND**

22 The Court hereby adopts the facts as summarized by the 5th DCA in its opinion dated October
23 23, 1998:

> Hearnes was apparently romantically interested in Stacy Edwards, who lived with her aunt, Bertha Wright. Hearnes occasionally visited the Wright apartment on Chance Street in Fresno. Wright lived with Stacy, Stacy's young children, her daughter Felicia Wright, and Felicia's boyfriend Tommy Brown. In the early evening of October 1, 1996, Wright, Stacy, Felicia and Tommy were playing cards at a table just outside their apartment. Hearnes walked up to the group and at one point laid a gun on a chair next to Wright. Wright told Hearnes that he could not keep the gun there. Tommy took the gun, stored it inside the apartment, and gave it back to Hearnes after the children went to bed.

Tawana Thacker also visited the apartment that evening. Hearnes placed the gun on his lap. He told Thacker it was .380 and it contained bullets which would "make you bleed internally and externally."

Hearnes asked Tommy if he could borrow Tommy's burgundy-red mountain bike to get home. Hearnes promised to return it the next day. At 11:30 p.m., Felicia and Stacy walked to a nearby store with Hearnes, who was riding the bicycle. Hearnes returned to Bertha Wright's apartment with Felicia and Stacy and briefly talked to Tommy. As Tommy said goodnight to Hearnes, he noticed a car entering the apartment parking lot. Tommy went inside to play video games. Hearnes had Tommy's bicycle.

Mary Miles lived with her children, Rita Vaughn, Teborah Vaughn, and Adell Vaughn, in the apartment next to Bertha Wright's apartment. Terry Palmer, the sixteen-year-old victim, was dating Teborah. Palmer picked up Adell that afternoon and returned with him between 12:30 and 12:40 a.m. the morning of October 2.

According to Adell, Palmer drove into the parking lot and Adell saw Hearnes talking to Tommy outside Wright's apartment. Palmer parked in a stall and Adell gathered his things from the car. As Adell approached his apartment he passed Hearnes. Hearnes walked toward Palmer's car. About a minute after Adell entered his apartment, he heard a gunshot. When Adell looked outside, he saw Hearnes riding away on a mountain bike.

Teborah was looking out the apartment window as Adell arrived. She saw Hearnes talking to Palmer, who was still sitting inside his car. Teborah walked to Rita's room and talked to her briefly. Suddenly, she heard a gunshot.

Mary Miles greeted Adell at the front door when he returned. Just after Adell entered the apartment, Miles heard a gunshot. When Miles looked outside, she saw Hearnes running away from Palmer's car. The car lurched forward, crashing into a brick wall. Everyone ran outside. Miles, Adell, and Teborah saw Hearnes riding away on a mountain bike. Miles and Adell noted Hearnes was peddling hard as he left on the bicycle. Miles and Percy Williams pulled Palmer out of his car. Palmer had a gunshot wound to his right temple.

Eleanor Rodriguez lived on the second floor of the apartment building. She was awake between 12:30 and 12:45 a.m. preparing a bottle for her baby. Rodriguez heard a conversation outside and went to her window. She saw a man standing next to the driver's side of a car talking to the driver. She heard the man who was standing say, "that is fucked." Rodriguez then saw him pull a gun from his waist, take two steps back, point at the driver's head, and fire a round. The boy in the car slumped over and the car ran into a brick wall. The shooter ran out of the parking lot and rode away on a mountain bike.

Within five to ten minutes after the shooting, Hearnes began calling Wright's apartment. He asked Felicia what happened and told her he heard a Mexican man arguing with a man in a car and then heard a gunshot. Felicia told Hearnes the police had his name. Hearnes told her that he "didn't do it." The phone continued ringing most of the evening and up to ten times a day throughout the next week. Tommy answered several of the calls. Hearnes told Tommy that he heard the shooting as he rode away, that he did not want to stop, and that he was calling to find out what happened. Hearnes wanted to know if the police had made inquiries about him. Tommy told Hearnes to stop calling, but Hearnes continued to do so anyway. Eventually, Wright had her phone number changed.

A shell casing was found close to Palmer's car. The casing was designed for use in a semiautomatic pistol and was consistent with those used in a .380 caliber handgun. Dr. Venu Gopal was the forensic pathologist who examined Terry Palmer. Palmer died from a gunshot wound to the head which caused substantial damage to his brain. Dr. Gopal removed a

copper jacket bullet from Palmer's head. A criminologist testified that the bullet, which had changed shape when it hit Palmer's skull, was characteristic of a 9 millimeter or a .380 caliber bullet.

Hearnes was not arrested until he was found in Southern California on February 14, 1997. After receiving his *Miranda* [footnote: *Miranda v. Arizona* (1966) 384 U.S. 436] warnings, Hearnes waived his right not to speak. Hearnes told Officer Castellanos that he knew Terry Palmer. Hearnes and Palmer were homies (friends) who used to sell dope together. There were no problems between them. Hearnes explained he had last seen Palmer the third week in September of 1996. Hearnes was preparing to go to Sacramento and encouraged Palmer to go with him but Palmer refused.

Hearnes told Castellanos that shortly after meeting with Palmer, he, his father, and his brother went to Sacramento to work on a house. Hearnes stayed with his cousin Robby Scott in Sacramento until he moved to Southern California.

Hearnes asked Castellanos when Palmer had been killed. Castellanos told him it occurred in the early morning of October 2, 1996. Hearnes asked if Palmer had been stabbed or shot. Castellanos did not reply. Castellanos asked Hearnes if this was the first time he was aware that Palmer had been shot. Hearnes replied, "yes." Hearnes later said he guessed Palmer had been shot because that was how everyone was being killed. Hearnes asked if the gun had been recovered and Castellanos replied that it had not been found. Hearnes told Castellanos that his fingerprints would be on Palmer's car because Hearnes had been in it many times.

Hearnes denied that Wright's family were his friends and denied being at their apartment on the evening of the shooting. Hearnes stated he had been at the apartment complex before he left for Sacramento to see the sister of his friend Shamar.

Castellanos told Hearnes that the result of the police investigation was that several witnesses placed him with Palmer at the time of the shooting and that the police thought he was involved with the shooting. Hearnes told Castellanos that this was the second time this happened. Castellanos understood Hearnes to mean that this was the second time he, Hearnes, was being accused of a shooting. Hearnes told Castellanos that he had never been in "that type of situation before." Hearnes again denied involvement in Palmer's shooting.

Lavell Washington testified that two or three weeks before Palmer was killed, Hearnes rode up to Palmer's house. Palmer asked Hearnes if Hearnes wanted to fight him because he heard a rumor Hearnes did want to fight. Hearnes replied "no" and rode away. Hearnes' father testified he and Hearnes went to Sacramento on the last weekend in September to paint a house, but they both returned to Fresno the next day.

See pp. 2-6, Exhibit D, Answer.

## DISCUSSION

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

1  Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court,
2  which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly,
3  the Court has jurisdiction over the action.

4  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of
5  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.
6  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114
7  F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*
8  *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)
9  (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was
10  filed after the enactment of the AEDPA; thus, it is governed by its provisions.

11  **II.  Legal Standard of Review**

12  This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody
13  pursuant to the judgment of a State court only on the ground that he is in custody in violation of the
14  Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

15  The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death
16  Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70
17  (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the
18  adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable
19  application of, clearly established Federal law, as determined by the Supreme Court of the United
20  States" or "resulted in a decision that was based on an unreasonable determination of the facts in
21  light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,
22  538 U.S. at 70-71; see Williams, 529 U.S. at 413.

23  As a threshold matter, this Court must "first decide what constitutes 'clearly established
24  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,
25  *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court
26  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time
27  of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly
28  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

///

///

///

### III. Review of Petitioner's Claims

**A. Ground One:** "Hearnes' conviction is unconstitutional because he did not receive effective assistance of counsel as guaranteed by the Sixth Amendment."

In his first ground for relief, Petitioner claims he was denied the effective assistance of counsel because trial counsel: 1) "Failed to object to the highly prejudicial evidence, offered through the testimony of Detective Castellanos that (a) petitioner was a 'drug dealer,' (b) this was the second time petitioner had been accused of a shooting, and (c) petitioner had been arrested for possession of a firearm"; 2) "Failed to object to highly prejudicial evidence that petitioner was a 'gang member'"; 3) "Failed to object to highly prejudicial evidence that petitioner had been incarcerated at juvenile hall"; 4) "Failed to investigate and develop the possibility that someone other than petitioner committed the murder"; 5) "Failed to request a voluntary manslaughter instruction"; and 6) "Failed to object to the constitutionally invalid implied malice instruction. Petitioner also claims appellate counsel was ineffective because he failed to argue that 1) "trial counsel was ineffective"; 2) "the trial court violated petitioner's due process rights to a fair trial by: (a) the failure to instruct sua sponte on voluntary manslaughter . . ., and (b) the erroneous instruction on implied malice."

### 1. Standard of Review - Ineffective Assistance of Counsel

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. <u>Id</u>. at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," 466 U.S., at 694. Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. See Strickland, 466 U.S. at 692; United States v. Cronic, 466 U.S., at 659, and n. 25, 104 S.Ct., at 2046-2047, and n. 25 (1984).

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

2. Failure to Object to Character Evidence - Admissions

Petitioner first claims defense counsel failed to object to the evidence elicited from Detective Castellanos that Petitioner was a "drug dealer," that Petitioner had been accused of a shooting before, and that Petitioner had been arrested for possession of a firearm.

This claim was first presented on direct appeal to the 5th DCA. See Exhibit D, Answer. The claim was rejected in a reasoned opinion dated October 23, 1998. Id. In rejecting the claim, the appellate court noted that it was likely defense counsel's tactic not to object because the statements were Petitioner's own and contained exculpatory implications. Id. The appellate court's conclusion was not unreasonable. In addition to the above-noted admissions in Petitioner's statements to the

detective, Petitioner admitted he knew the victim but did not have any problems with him. (RT[2] at 600-01.) He told the detective that he had last seen him in the third week of September of 1996[3], and at that time, Petitioner had encouraged him to accompany him to Sacramento. (RT at 601.) Petitioner stated he left twenty-four hours later for Sacramento with his brother and his father. (RT 602.) He stated he stayed in Sacramento until he moved to Buena Park. (RT 602.) Petitioner denied being at the location of the shooting at the time of the shooting. (RT 606.)

At the post-remand hearing, defense counsel argued it was his trial tactic not to object to the detective's statements because the negative character evidence was presented within the context of an exculpatory statement. Defense counsel stated:

> In this case, Mr. Hearnes denied ever having killed anybody, it was an exculpatory statement and especially in light of the fact there [sic] Mr. Hearnes refused my advice that he would testify in his own defense, I was thankful to have an exculpatory statement from Mr. Hearnes get in front of the jury.

(Hearing RT at 55.)

In addition, as argued persuasively by Respondent, defense counsel could have believed that Petitioner's candid admissions would lend credibility to his statement that he was not involved in the shooting. Petitioner's arguments do not overcome the strong presumption that counsel's decision was a sound trial tactic.

In addition, Petitioner has not demonstrated prejudice. The appellate court stated that the prosecution had a very strong case against Petitioner:

> Several witnesses placed Hearnes at the scene of the crime. Mary Miles, Adell Vaughn, Teborah Vaughn saw [Petitioner] approaching [the victim's] car or standing at [the victim's] car just before the shooting. Bertha Wright, Stacy Edwards, Felicia Wright, and Tommy Edwards testified at length concerning [Petitioner's] activities around their apartment just prior to the shooting. Tommy let [Petitioner] borrow his mountain bike. Bertha Wright and Tommy testified that [Petitioner] was in possession of a gun that evening. Tawana Thacker testified that [Petitioner] told her his gun was a .380 caliber gun and that it contained bullets that could make one bleed internally and externally. Immediately after the shooting, Mary Miles, Adell Vaughn, Teborah Vaughn saw [Petitioner] riding away from the scene on a mountain bike.
>
> Eleanor Rodriguez gave a riveting account of how she watched a man who was standing argue with the young driver of a car, stand back, aim a handgun, and fire it at the

---

[2] "RT" refers to the Reporter's Transcript on Appeal lodged with the Court.

[3] The incident took place in the early morning hours of October 2, 1996.

victim's head. Though Rodriguez could not positively identify [Petitioner] at trial, the testimony of other witnesses placed him at [the victim's] car and in possession of a gun. Rodriguez herself saw the shooter leaving the scene on a mountain bike. Lavell Washington testified that [Petitioner] had a verbal confrontation with [the victim] on an earlier occasion. A shell casing found at the scene and the bullet found in the victim's skull were consistent with a .380 caliber semiautomatic handgun.

Furthermore, [Petitioner] flew from the scene immediately after the shooting and apparently left Fresno altogether. Flight from a scene of a crime is properly associated with consciousness of guilt. [Footnote omitted.] [Petitioner] also frantically called Wright's apartment soon after the shooting to find out what the police knew and to deny involvement with the shooting. [Petitioner] continued to call Wright's apartment for days after the shooting until she had her phone number changed. When Officer Castellanos interviewed [Petitioner], [Petitioner] knew the victim had been shot. Castellanos did not reveal this information to [Petitioner] and [Petitioner] claimed he was not in Fresno when the shooting occurred.

See pp.7-8, Exhibit D, Answer.

In light of all the evidence, Petitioner cannot demonstrate that there "is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694.

2. Failure to Object to Character Evidence - Gang Affiliation

Petitioner next claims defense counsel failed to object to the evidence that Petitioner was a member of a gang. However, the record reveals that defense counsel actually elicited this information from two witnesses. (RT at 242, 652.) The evidence showed that Petitioner and the victim were members of the same gang, the "Fink White Deuce Gang." (RT at 652.) This line of questioning was likely a tactical move by defense counsel to demonstrate the lack of motive for the killing, for members of the same gang would be less likely to kill each other. Petitioner has not shown that counsel's decision was not a sound trial decision. Moreover, as previously discussed Petitioner has failed to demonstrate prejudice resulting from counsel's alleged failure.

3. Failure to Object to Character Evidence - Prior Incarceration

Petitioner next claims defense counsel failed to object to the evidence that Petitioner had previously been incarcerated at juvenile hall. This evidence was elicited from witness Tommy Brown during examination by the prosecutor. When asked how he knew Petitioner, Tommy Brown stated from "a court school we went to together." (RT 190.) Tommy Brown clarified his understanding of a court school as being "[a] school you go to after you get out of juvenile." (RT 190.)

Petitioner has failed to demonstrate any error on the part of defense counsel. Counsel may have chosen to avoid highlighting the evidence for the jury by objecting. On the other hand, as argued by Respondent, trial counsel may have believed the evidence that the witness had been in juvenile hall would undermine his credibility before the jury. As noted by Respondent, trial counsel's strategy was to attack the credibility of the witnesses. (Hearing RT at 44-45.) In either case, Petitioner has not shown that counsel's alleged failure was not sound trial strategy.

Petitioner has also failed to demonstrate any prejudice resulting from counsel's alleged failure to object. The statement offered no information on Petitioner's past criminal history. From the brief statement, the jury could not determine whether Petitioner had been in juvenile hall or what crime Petitioner may have committed. In light of the prosecution's case against Petitioner, there is no likelihood that the result would have been any different had counsel objected.

### 4. Failure to investigate other possible suspects

Petitioner claims that defense counsel failed to investigate and develop the possibility that someone other than Petitioner committed the murder. Petitioner first complained of this alleged failure by counsel in the post-remand hearing before the trial court. (Hearing RT at 36-37.) Petitioner claimed that the victim's brother, Shakeel Palmer, had heard about a drug deal involving $1,000 worth of drugs that the victim had lost. Defense counsel responded to Petitioner's allegation:

> Judge, first of all every statement that that witness gave in that report was hearsay. What he says in that report is he heard rumors on the street that this might be so and that might be so. What he does say is that he thought it was over a drug deal and I recalled that the statement that – the interview that the police conducted with Mr. Hearnes after he was taken into custody in Sacramento was that he had been involved a little bit in dealings from drugs with T.J. in the past. So getting information in that it might have been about drugs I didn't think was going to help Mr. Hearnes case at all. Besides the fact that none of that evidence was going to come into court and Shakeel Palmer, if we could ever find him, would never testify there was somebody else involved in shooting T.J. and he didn't know anybody who shot T.J. He knew nothing about the case.

(Hearing RT at 37-38.)

Petitioner continued to complain of defense counsel's alleged ineffective investigation, to which defense counsel replied:

> First of all, the District Attorney's office has the entire sheriff's department and police department at their disposal. They can send these officers out and say follow up on this lead and see what you find and if you find anything, come back and tell me. I don't have that luxury. I don't have hundreds of investigators scouring the streets out there. Second of all,

everything that Shakeel Palmer said is hearsay. Third of all there was no way Shakeel Palmer was going to come to court to testify. Fourth of all, we're again dealing with a situation where Mr. Hearnes was the only suspect. Everybody saw Mr. Hearnes walk towards the car. Everybody saw Mr. Hearnes ride off on the bicycle immediately after the shooting. Mr. Hearnes then left town and then lied to the police about his whereabouts the night of the shooting, claiming he had been in Sacramento with his father the day of the shooting when in fact he had been at the apartment complex that day.

(Hearing RT at 39.)

From the record, it is apparent counsel made a tactical decision not to pursue further investigation into Shakeel Palmer's statement, because the statement was far too weak to merit expending valuable resources. Shakeel Palmer's statement was based entirely on rumor and had nothing to do with the actual murder. The only inference that could be drawn from Palmer's statement was that a motive may have existed for someone to be displeased with the victim; however, Palmer's statement offered nothing with respect to the murder. Also, the statement did not help Petitioner in any way given his own admitted drug dealings with the victim. In light of the strong evidence previously discussed of Petitioner being the only suspect, it was not unreasonable for counsel to forego further investigation into Palmer's statement and focus instead on the credibility of the witnesses.

In addition, Petitioner has failed to demonstrate prejudice resulting from counsel's decision not to investigate further. Petitioner submits no evidence that an investigation would have yielded anything benefitting Petitioner.

### 5. Failure to request a voluntary manslaughter instruction

Petitioner next complains that defense counsel failed to request a voluntary manslaughter instruction. According to the record, defense counsel requested that the trial court not instruct on lesser included offenses. When asked why defense counsel opted to omit these instructions, counsel stated:

I don't feel any evidence was presented to suggest this killing was the product of a sudden quarrel or a heat of passion. Mr. Hearnes - - in my own defense in this case and my arguments to the jury is that Mr. Hearnes was not the shooter in this case. I feel it would be counterproductive to our case to try and argue to the jury that perhaps he was the shooter but there was some mitigating factors which reduce this to a lesser crime. I have preferred to simply submit to the jury the issue of whether Mr. Hearnes was the shooter and have them decide whether this was first or second degree murder, as opposed to asking for a voluntary or involuntary manslaughter.

(RT at 805.)

Therefore, as demonstrated by the record, defense counsel had a specific tactical purpose in foregoing the voluntary manslaughter instruction. As stated by Respondent, the defense was that Petitioner did not do the shooting, not that he did it under mitigating circumstances. It was not unreasonable for defense counsel to reject an instruction that was inconsistent with the defense.

Furthermore, Petitioner has failed to show any prejudice resulting from counsel's decision. There was almost no evidence supporting a voluntary manslaughter theory. The Court notes that there was evidence of a witness hearing the shooter tell the victim, "That is fucked." However, this statement offers little support for a defense theory of heat of passion or sudden quarrel. Based on the weak and nearly non-existent evidence supporting these other defense theories, defense counsel's decision to opt for an all-or-nothing defense was not unreasonable.

6. "Failure to object to the implied malice instruction

In his final claim of ineffective assistance of his trial counsel, Petitioner alleges counsel failed to object to the implied malice instructions provided to the jury. However, as pointed out by Respondent, the instruction given was proper under California law. See People v. Dellinger, 49 Cal.3d 1212, 1222 (1989). In addition, Petitioner has not demonstrated a federal constitutional right to a different implied malice instruction. Therefore, defense counsel did not commit any error by failing to object.

7. Ineffective assistance of appellate counsel

Petitioner next claims his appellate counsel was ineffective in failing to raise claims of ineffective assistance of trial counsel, trial court error in failing to instruct on voluntary manslaughter, and the alleged erroneous instruction on implied malice.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test. See, e.g. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986). A defendant must therefore show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's

unprofessional errors, defendant would have prevailed on appeal. Miller, 882 F.2d at 1434 & n. 9 (citing Strickland, 466 U.S. at 688, 694; Birtle, 792 F.2d at 849). However, appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Miller, 882 F.2d at 1434 n. 10. The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. Id. at 1434 (footnote and citations omitted). As a result, appellate counsel will frequently remain above an objective standard of competence and have caused her client no prejudice for the same reason – because she declined to raise a weak issue. Id.

Here, none of the claims Petitioner argues appellate counsel should have raised have merit. Therefore, it cannot be said that appellate counsel acted unreasonably. Thus, the state court properly rejected this claim.

**B. Ground Two:** **"Petitioner was deprived of his right to a fair trial and his conviction violates federal due process of law because of the cumulative impact from the multitude of errors committed by the trial court, and defense counsel."**

In his second ground for relief, Petitioner claims the cumulative impact of the alleged errors committed by the trial court and defense counsel establishes prejudice.

A defendant may prove that he has suffered prejudice based on the cumulative effect of errors. Kyles v. Whitley, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether exculpatory evidence suppressed by state is sufficiently material to violate Due Process Clause, court is required to assess "cumulative" or "net" effect of all suppressed evidence and commits legal error if it only conducts piecemeal analysis of each item of suppressed evidence); O'Neal v. McAninch, 513 U.S. 432, 435-36 (1995) (accepting lower court's assumption that "confusion arising out of a trial court instruction about the state of mind necessary for conviction combined with a related statement by a prosecutor" required habeas corpus relief if "combined" error was not harmless); Fuller v. Roe, 182 F.3d 699, 704 (9th Cir.1999) ("cumulative effect of several errors may prejudice a defendant to the extent that his conviction must be overturned"); Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir.1978) (concluding cumulative effect of alleged errors may demonstrate prejudice), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542 (1979).

In this case, however, none of the claims raised by Petitioner have merit. Accordingly, Petitioner cannot demonstrate prejudice resulting from the cumulative effect of the errors as the Court finds no errors to accumulate. See Villafuerte v. Stewart, 111 F.3d 616, 632, (9th Cir.1997) (*per curiam*). Accordingly, the Court finds no denial of due process.

**C. Ground Three:   "The trial court violated due process by failing to instruct on voluntary manslaughter."**

Petitioner next claims the trial court erred in failing to *sua sponte* instruct the jury on the lesser included offense of voluntary manslaughter. Petitioner claims there was substantial evidence supporting a possible conviction for manslaughter.

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. Beck v. Alabama, 447 U.S. 625, 638 (1980).  In a noncapital case, the failure of a trial court to instruct *sua sponte* on lesser included offenses does not present a federal constitutional question. Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998); Turner v. Marshall, 63 F.3d 807, 813 (9th Cir.1995), *overruled on other grounds* by Tolbert v Page, 182 F.3d 677 (9th Cir.1999) (*en banc*) (finding the application of Beck to noncapital cases barred by Teague v. Lane, 498 U.S. 288, 299-300, 109 S.Ct. 1060, 1069 (1989));  James v. Reese, 546 F.2d 325, 327 (9th Cir.1976) (*per curiam*).  However, a defendant may suffer a due process violation if the court's failure to give a requested instruction prevents a defendant from presenting his theory of the case. Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984); see, also, United States v. Mason, 902 F.2d 1434, 438 (9th Cir.1990) ("A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence.").

In Bashor v. Risley,  730 F.2d 1228, 1240 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984), the Ninth Circuit recognized that a court's failure to give a lesser included instruction did not present a federal constitutional claim. Bashor, 730 F.2d at 1239.  Nevertheless, the Court found "no fundamental unfairness in the trial court's failure to instruct on a lesser included offense" to a homicide charge as counsel did not request the lesser included offense instruction and the defense strategy was based "on the theory that Bashor was either guilty or not guilty of deliberate homicide."

1  Id.

2   In the instant case, as in Bashor, trial counsel for Petitioner stated on the record that he would
3  not request any lesser included offense instructions and stated that he objected to the giving of such
4  an instruction. (RT 805-806.) Thus, counsel opted for an all-or-nothing approach. As Petitioner's
5  defense was that he was not the shooter, the Court finds that the trial court's decision not to give the
6  manslaughter instruction did not prevent Petitioner from presenting his defense theory. Accordingly,
7  no constitutional violation of due process occurred and the claim should be denied.

**D. Ground Four:    "The trial court violated due process as guaranteed by the 14th Amendment by erroneously defining implied malice."**

 In his next ground for relief, Petitioner claims the trial court erroneously instructed the jury in its definition of implied malice. Petitioner alleges the instruction violated due process because it allowed the jury to convict Petitioner of second degree murder without a finding of a specific intent to kill. Petitioner argues the instruction omitted the necessary element of the crime that the killing must show an "abandoned and malignant heart." Petitioner argues that the CALJIC instruction violates the separation of powers rule by enlarging or changing the statutory definition of implied malice.

 As previously discussed, the instruction was properly given under California law. People v. Dellinger, 49 Cal.3d 1212, 1222 (1989). The California Supreme Court noted that the phrase complained of - "abandoned and malignant heart" - was confusing, misleading, and superfluous. People v. Phillips, 64 Cal.2d 574, 587 (1966). Because the California Supreme Court has the final say with respect to interpreting California law, this Court is bound by the California Supreme Court's finding that the implied malice instruction was proper.

 Petitioner's claim that the California Supreme Court's interpretation violates the separation of powers rule is meritless. In People v. Watson, 30 Cal.3d 290 (1981), the California Supreme Court did not unconstitutionally alter or enlarge the statutory definition of implied malice contained in Cal. Penal Code § 188. The court merely interpreted the statute. The traditional role of the courts is to interpret law. As stated by the California Supreme Court, the phrase "abandoned and malignant heart" "adds nothing to the jury's understanding of implied malice; its obscure metaphor invites

U.S. District Court
E. D. California

cd                                    17

confusion and unguided speculation." Phillips, 64 Cal.2d at 587.  The California Supreme Court's interpretation and suggestion that the language not be used does not offend the principle of separation of powers.

In addition, Petitioner has not demonstrated a federal constitutional right to a different implied malice instruction. As Respondent correctly states, the Constitution does not require an accused to harbor a specific intent to kill for a conviction of murder. Accordingly, the state court rejection of this claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim must be denied.

> **E. Ground Five:** "The trial court violated due process as guaranteed by the Fourteenth Amendment, and Petitioner's right to confrontation, as guaranteed by the Sixth Amendment, by the trial court reading back testimony without Petitioner's presence or consent."

In his final claim for relief, Petitioner alleges the trial court violated his due process rights in permitting the readback of testimony to the jury outside the presence of Petitioner. Petitioner claims the readback of testimony is a critical stage of the proceedings, and therefore, Petitioner's Sixth Amendment right to be present was violated because Petitioner was not present at the readback and did not consent to the readback outside of his presence.

In Rushen v. Spain, 464 U.S. 114, 117 (1983), the Supreme Court recognized that "the right to personal presence at all critical stages of the trial ... [is a] fundamental right[] of each criminal defendant."  Implicit in this holding, however, is the limitation of that right, which is a defendant does not have the right to be present at non-critical stages of the trial. In La Crosse v. Kernan, 244 F.3d 704, 708 (9th Cir.2001), the Ninth Circuit noted that the Supreme Court "has never addressed whether readback of testimony to a jury is a 'critical stage[] of the trial' triggering a criminal defendant's fundamental right to be present." Given the lack of guidance from the Supreme Court, this Court cannot say that the state court decision was contrary to clearly established Federal law as established by the Supreme Court.

Nevertheless, in Williams v. Taylor, 529 U.S. 362, 398 (2000), the Supreme Court held that a

U.S. District Court
E. D. California

cd

18

state court decision may represent an unreasonable application of Supreme Court precedent if it "unreasonably refuses to extend [an established legal principle] to a new context where it should apply." In Fisher v. Roe, 263 F.3d 906, 915-17 (9th Cir.2001), the Ninth Circuit found such a case in this context. In Fisher, the trial court read testimony back to the jury without the knowledge or consent of the defendants *or their attorneys*. Id. The Ninth Circuit distinguished La Crosse based on the fact that in La Crosse the defense attorney "was consulted by the court and agreed to the proposed procedure and stipulated that his client need not be present." Id. at 916. In Fisher, however, the readback "occurred not only in the absence of the defendants and their lawyers, but without their knowledge and participation." Id.

Here, the trial court consulted Petitioner's defense counsel with respect to the readback of testimony to the jury. (RT 925.) Defense counsel stipulated to allowing the court reporter to go into the jury deliberation room and read the testimony back to the jury. (RT 925.) As Respondent correctly notes, Petitioner was also present during this stipulation. (RT 925.) Therefore, the facts in this case are very much like those in La Crosse. The factual situation presented in Fisher is distinguishable. Accordingly, the state court rejection of this claim was also not an unreasonable application of clearly established Federal law as set forth by the Supreme Court. Therefore, the claim should be denied.

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED and the Clerk of Court be DIRECTED to enter judgment.

These Findings and Recommendations are submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.

1  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The
2  parties are advised that failure to file objections within the specified time may waive the right to
3  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:     December 7, 2005**             /s/ **Sandra M. Snyder**
icido3                                            UNITED STATES MAGISTRATE JUDGE